UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Sandy Pennington, : Case No. 1:13-cv-826
:
    Plaintiff, :
:
vs. :
:
Engineered Packaging services Co., Inc., :
and Callos Management Co., Inc., :
:
    Defendants. :

**ORDER**

Defendants, Engineered Packaging Services ("EPS") and Callos Management Company ("Callos"), have each moved for summary judgment on the Plaintiff's complaint. (Docs. 29 and 32) Each Defendant contends that Plaintiff's claims, arising from the termination of his employment, lack merit and should be dismissed. For the following reasons, the Court will grant in part and deny in part Defendants' motions.

**FACTUAL BACKGROUND**

EPS is a packaging company, providing various types of packaging and boxing services to its customers. Callos is an independent provider of human resources, payroll, staffing, and employee benefit services to other companies. From February 2009 through the end of April, 2012, EPS and Callos were parties to a "Subscriber Services Agreement" which described the services provided by Callos to EPS. (Keish Dep. Ex. 1) EPS was formerly known as Mac-Pack Services, Inc.

Sandy Pennington (also known as "Pete"), was hired by Mac-Pack in November 2007, and was employed at the packaging plant owned by Mac-Pack in Batavia, Ohio.

Pennington was responsible for all aspects of production at the plant, and keeping its owners informed about the production.  In February 2009, Mac-Pack was voluntarily dissolved by its partners.  Dan McLaughlin formed EPS and bought Mac-Pack's facility, equipment and employees, becoming EPS' sole owner.  McLaughlin avers that at that time, EPS' annual sales were less than $1 million, and the company had six employees, including Pennington who was the plant supervisor.  McLaughlin wanted to develop additional business for his company, and was traveling away from Ohio a great deal at that time.

In early 2010, Pennington required heart surgery.  He was off work for about eight or nine weeks.  EPS paid him his regular salary while he was off work, and he returned to the same position at the same salary after his leave.  He was not disciplined in any way after returning from his leave.  In the latter part of 2011, EPS secured a contract with Toyota to package its windshields.  McLaughlin wanted to increase his company's efficiency in producing packaged windshields using a "skinpack" machine.  According to McLaughlin, EPS' average production rate was about 20 windshields per hour.  He believed that higher numbers would be needed to keep the Toyota business, and he decided to hire a consultant to advise him on increasing the plant's efficiency.

Jack Morrow testified that he was approached by a recruiter in late 2011 about an opportunity with EPS.  Morrow had previous experience as a manufacturing consultant, including services to three other packaging companies.  McLaughlin and Morrow met and discussed EPS and McLaughlin's plan for growth.  McLaughlin hired Morrow as an independent consultant, with the understanding that this arrangement could lead to full-time employment with EPS.  Morrow had daily contact with Pennington

at the Batavia plant. Morrow claims that he initially observed the plant's operations, including the use of the skinpack machine for packaging windshields. Morrow believed that EPS employees were not efficiently operating the packaging line, and were packaging 12-16 windshields per hour. He observed that the employees lacked proper training, and had no established expectations for productivity. Morrow researched the manufacturer's literature about the skinpack machine, where he discovered that the manufacturer estimated hourly production rates of approximately 32 windshields per hour using the machine. Morrow asserts that he discussed increasing production with Pennington, who responded that 32 per hour was only a suggestion, and that EPS employees should not be pushed too hard. Morrow states that as he made additional suggestions for changes in production, Pennington became increasingly resistant to his suggestions.

Pennington testified that he never had any conversations with Morrow about any production deficiencies. He testified that he and Morrow "had a lot of different talks about different, different things, how this may work better, how this may do better..." but could not recall the specifics of those conversations. (Pennington Dep. at 76) Pennington estimated that when he worked the skinpack machine, they packaged about 300 windshields per 8-hour shift, or about 35 per hour. Production on any given day would vary depending on the product or order being packaged. He described a production sheet that was attached to the machine, and the operator would record the number on the sheet. Pennington also testified that the production rate did not change once Morrow began working at EPS.

According to Morrow, he and Pennington decided to challenge each other to

determine whose production process would yield the highest output from the skinpack machine.  During the first week of this challenge, Pennington was in charge; Morrow claims that he produced an average of 12-16 windshields per hour that week.  The second week Morrow implemented the suggestions he believed would improve production (he describes these as a better level of communications, establishing accountability and clearly identified expectations for the employees).  By the end of the second week, production levels were about 32 windshields per hour.  After this two-week period, Morrow states that McLaughlin offered him a full-time job as plant manager in late January 2012, and Pennington began reporting to Morrow.  Pennington denies that this "challenge" ever took place, and he does not recall Morrow suggesting packaging in a manner that differed from his own. that he did not recall production rate changed at all after Morrow was hired.

      Morrow claims that one of his first tasks was to do performance evaluations.  Morrow avers that he met with Pennington on February 21, 2012 to review his performance and provide him a written evaluation.  He told Pennington that he needed to support Morrow's changes to production and his decision-making going forward.  Morrow avers that Pennington refused to sign his written evaluation, which was very critical of Pennington and rated his overall performance as 1.7 (on a scale of 1-4, with 4 being the highest rating).  The written evaluation form states that Pennington told Morrow that he would be contacting Callos.  (Doc. 32, Morrow Dec. Ex. A)  Pennington testified that he never saw this written evaluation form before he was terminated, and Morrow never presented it to him for his signature.

      Morrow avers that Pennington's performance and attitude did not improve over

the next several weeks, and that Morrow decided to terminate him. There is a form attached to the February 2012 performance evaluation in which Morrow notes that Pennington has not improved since the date of that evaluation. After discussing it with McLaughlin, Morrow contacted Callos and they agreed to send someone to the plant to attend the termination meeting with Pennington.

Chuck Keish, a sales representative for Callos, testified that his boss asked him to contact EPS and take care of the request. Keish visited the EPS plant on March 14, 2012 to participate in Pennington's termination meeting. Keish and Morrow called Pennington into an office, and Keish informed him his position was being eliminated. Morrow did not know that Pennington had any kind of medical condition or disability at the time he was terminated. Pennington was 60 years old when he was terminated; Jack Morrow (who Pennington argues took his position) was 37 at that time.

Pennington timely filed EEOC claims against both EPS and Callo in July 2012, asserting that he had been terminated unlawfully based on his age, and/or based on a perceived or actual disability. (Pennington Dep. Ex. 3) After an investigation, the EEOC issued a right-to-sue letter. Pennington timely filed his complaint in this case on November 12, 2013 against EPS and Callo, alleging five claims for relief. (Doc. 1) After engaging in discovery, EPS and Callo each filed motions seeking summary judgment on all of Pennington's claims. Because the motions are essentially identical, the Court will consider them together. Pennington does not oppose the motions with regard to his disability and FMLA claims (Counts 2, 3 and 4 of his complaint). But he argues that there are genuine factual disputes regarding his claims for age discrimination (Count 1) and for ERISA retaliation (Count 5).

## DISCUSSION

Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An assertion of an undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers.  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts.  Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th Cir. 2002).  Once that occurs, the party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

The burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250.  The non-moving party "must do more than simply show that

there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

Age Discrimination

The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer to discharge an employee who is at least 40 years old because of the employee's age. 29 U.S.C. §§ 623(a)(1). Ohio law also prohibits the discharge of an employee based on that person's age. Ohio Rev. Code § 4112.02(A). Ohio age-discrimination claims are analyzed under the same standards that apply to claims under the ADEA. Minadeo v. ICI Paints, 398 F.3d 751, 763 (6th Cir. 2005).

Pennington may show a violation of the ADEA by relying on either direct or circumstantial evidence of discrimination. In either case, he has the burden of persuasion that his age was the "but-for" cause of the adverse action. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009). Pennington does not offer direct evidence of age discrimination, and relies on circumstantial evidence. He argues that he has established a prima facie claim. In order to do so, he must show that (1) he was over

40 years of age; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was replaced by a significantly younger person. Grosjean v. First Energy Corp., 349 F.3d 332, 335 (6th Cir. 2003). Defendants do not dispute the first, third, or fourth prong of this test, but contend that Pennington was not qualified for his job for the reasons identified by Morrow.

A plaintiff's qualifications at the prima facie stage should be measured objectively. The Court may not consider the alleged nondiscriminatory reason offered by Defendants at this stage when considering whether he was objectively qualified for his job. Wexler v. White's Fine Furniture, 317 F.3d 564, 574-575 (6th Cir. 2003)(en banc), citing Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-661 (6th Cir. 1999). The Defendants assert that Pennington was terminated because he was not qualified, as reflected in his unacceptable performance and refusal to adhere to Morrow's suggestions for changes. Pennington had worked at the plant (first for Mac-Pac and then for EPS) for five years in the same position. There is no suggestion in the record that the company raised any concerns about his performance until shortly after Morrow arrived, which was just weeks before Pennington was terminated. The Sixth Circuit has repeatedly stressed that a discrimination plaintiff's prima facie burden is not intended to be an onerous one, and is easily met. The Court concludes that Pennington has established a prima facie age discrimination claim.

Defendants assert that Pennington was terminated due to his unacceptable performance. This is a burden of production only, not one of persuasion. Therefore, Pennington must come forward with evidence showing that this explanation is a pretext. He may do so by showing (1) the stated reason has no basis in fact, (2) the reason

given is not the actual reason for his termination, or (3) the reason is insufficient to explain Defendants' action in terminating him. See Imwalle v. Reliance Med. Products, Inc., 515 F.3d 531, 545 (6th Cir. 2008), citing Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994). The Sixth Circuit has made it clear that it has "... never regarded those categories as anything more than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?' " Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012).

Pennington argues that Defendants' articulated reason is false, and that he was actually terminated because McLaughlin wanted the substantially younger Morrow to replace him. Pennington never saw the February 2012 performance review before he was terminated. He claims that this written review first surfaced after he filed his EEOC charge, after the EEOC had asked Defendants for position statements, and after the EEOC investigator interviewed Morrow and McLaughlin in June 2013. When the EEOC investigator asked Morrow why Pennington was terminated, he responded: "Job performance, he [was] resistant to change. He was suppose[d] to be the leader on the floor but would be the first out the door. He had no clear leadership; poor leadership wasn't what is expected from a floor leader. He had checked out as far as the direction the company was moving forward towards." (See Doc. 34, Ex. C at PAGEID 539) Morrow also told the investigator that Pennington's position was eliminated, but there was no "downsizing" of the company. The EEOC's investigator conducted on-site interviews of both Morrow and McLaughlin on June 23, 2013. The EEOC documents Pennington obtained through an FOIA request include a cover letter from Dan

McLaughlin to the EEOC dated July 23, 2013, with which he sent to the EEOC the only personnel document in EPS' possession regarding Pennington; that document is the February 2012 performance review.  The last two pages of this document are entitled "Performance Review follow-up," signed by Morrow on March 7, 2012.  This document is not signed by Pennington.  Morrow stated in this form that Pennington had not improved in the areas Morrow described in the February 21 evaluation, and he recommended that Pennington's position be "eliminated." The form further indicates that copies should be sent to the employee's personnel file, and one to "your EMS HR Specialist."  (See Doc. 34, Ex. F at PAGEID 595.)  "EMS" is the company that EPS engaged to provide Professional Employer Services **after** McLaughlin cancelled Callo's contract on or about April 30, 2012, which is six weeks after Pennington was terminated.  Defendants do not explain why the performance evaluation documents were not provided to the EEOC before or at the time of the on-site interviews.

Chuck Keish testified that he was present on behalf of Callo during Pennington's termination meeting on March 14, 2012.  Keish met briefly that day with Dan McLaughlin and Jack Morrow, and they "talked about why [Pennington] was going to be terminated.  Basically Jack [Morrow] put in new procedures, new policies, streamlined things. [Pennington's] position was no longer needed.  That's how he stated it."  (Keish Dep. at 31)  Keish confirmed that the only thing he was told about the reason for Pennington's termination was that EPS "changed some policies and procedures" and so Pennington "was no longer needed."  (Id. at 36)  There was no mention of any performance difficulties or production concerns during this meeting.

Jack Morrow admitted that he never mentioned to Keish any issue regarding

-10-

Pennington's job performance, and never showed Keish the written performance review. He also admitted that prior to the date of that alleged review, he and McLaughlin had a conversation about terminating Pennington. (Morrow Dep. at 64) Defendants argue that there is no significance to this admission, because the reason Morrow was retained was to evaluate EPS' plant's efficiency, and discussions about employees would naturally be a part of that evaluation. But Pennington contends that McLaughlin hired Morrow with an intent to replace Pennington, and Morrow's admission at the least lends some credence to Pennington's contention.

Defendants assert that the purported factual discrepancies cited by Pennington are irrelevant and immaterial. They argue that the dispute about the date that the performance review document was created is not a genuine dispute, because Pennington has not shown that his performance was satisfactory, or that Morrow (and/or McLaughlin) did not genuinely believe that his performance was not satisfactory. But that argument entirely credits Morrow's testimony and ignores Pennington's version of these events. Credibility determinations are not for the Court when considering a summary judgment motion. Defendants also note that Pennington was hired when he was 55 years old, belying any suggestion that EPS would terminate him five years later based on age. But the record shows that Pennington was hired when the company was owned by different people and under different management, before McLaughlin became the sole owner of EPS. Morrow does not dispute that he did not tell Keish that Pennington's performance problems were the reason that he wanted to terminate Pennington; he simply told Keish that EPS was downsizing and letting people go. This testimony gives rise to at least a plausible inference that Morrow (and/or McLaughlin)

did not tell Keish what Defendants now contend is the real reason for the decision to avoid raising any questions or concerns about Pennington's termination.

Defendants also rely on the fact that EPS terminated several other employees who were substantially younger than Pennington between February and December 2012. (Doc. 29, Keish Affidavit at ¶ 7, and Exhibit A) There is no information in the record about the facts and circumstances surrounding these individuals, and no specific description of positions is provided. The fact that some younger employees were terminated in the same time frame does not mean that Pennington's termination was undisputedly based on his performance problems, as Defendants contend, and not due to his age.

The Court must conclude, after reviewing the entire record, that Pennington has established a genuine factual dispute over whether Defendants' stated justification for his termination is a pretext for age discrimination. Defendants' motions for summary judgment are therefore denied with respect to Count One.

ERISA Interference

ERISA prohibits an employer from discharging an employee who is a participant or beneficiary of an employee benefit plan, "for the purpose of interfering with the attainment of any right" the participant may become entitled to under that plan. 29 U.S.C. §1140. To succeed on this claim, Pennington must demonstrate that Defendants specifically intended to violate the statute when they terminated him. To establish a prima facie claim of interference with his ERISA rights, Pennington must show that his employer engaged in prohibited conduct, and did so with the purpose of interfering with his right under a benefit plan. Hammon v. DHL Airways, Inc., 165 F.3d

441, 451 (6th Cir. 1999). Defendants must then articulate a non-retaliatory reason for the action, and Pennington must show a genuine dispute that the reason is pretextual.

Pennington alleges in his complaint that Defendants knowingly terminated his employment with intent to interfere with his healthcare benefits, or to avoid further "vesting" of those benefits. (Doc. 1 at ¶58) He cites his testimony that he heard McLaughlin complain about the costs of health insurance on several occasions. There is no evidence that McLaughlin complained about the costs of Pennington's insurance, or that McLaughlin believed that insurance costs were higher because Pennington worked at the company. Pennington does not dispute that when he required leave for his heart conditions, EPS paid his full salary and his benefits continued when he returned. There is no evidence that EPS paid more for health coverage for its employees as a result of Pennington's heart surgery, which occurred two years before he was terminated.

Pennington relies on his testimony that he terminated one of his employees (Jim Curso) at some point during his time with EPS, and in that process McLaughlin told him that "... we needed to cut some fat, kind of trim down a little bit, and he was complaining about the health insurance costs, and this gentleman had just had a stroke." (Pennington Dep. at 53) But Pennington conceded that he **agreed** with McLaughlin that Curso should be terminated because he "wasn't very productive." (Id.) This isolated comment about another employee at some undefined point prior to Pennington's termination does not support a plausible inference that EPS or McLaughlin intended to interfere with Pennington's ERISA rights.

Pennington also cites the fact that a month and a half after he was terminated,

McLaughlin terminated Callos' contract and entered into a new contract with EMS. One aspect of that arrangement was obtaining new health insurance coverage for EPS' employees. Pennington suggests that the proximity of these events supports his claim that he was fired because McLaughlin wanted to reduce EPS' health insurance costs. He cites Smith v. Hinkle Mfg., Inc., 36 Fed. Appx. 825 829 (6th Cir. 2002), where the Sixth Circuit stated: "[T]emporal proximity between termination of employment and an event signaling increased costs to a benefit program can 'support an inference that the adverse actions were taken with the intent of interfering with future ... benefits.'" Id. at 829 (internal citations omitted).

The facts of that case distinguish it from Pennington's situation. The plaintiff in Smith was fired about two weeks after she told her supervisor that her son (who was covered by her employee health program) had been diagnosed with hydrocephalus, and needed immediate and expensive life-saving surgery. Two months before that, the plaintiff had received a good performance evaluation; and one month prior, she had been given an 8% raise, despite the existence of a customer's complaint about her lack of attention to its orders. Despite this record, her supervisor wrote a memo after firing her in which he described plaintiff's performance as "intolerable," and citing a series of customer complaints about her. Id. at 827. Plaintiff also cited a conversation she had with an accounting supervisor before she was terminated, who told plaintiff that families like plaintiff's were causing the company's insurance costs to rise, and they were a "drain on the company." Id. The Sixth Circuit held that she had established a prima facie claim, which the employer had conceded in the district court. It also held that she had established genuine dispute whether the stated reason actually motivated her

-14-

discharge.  All of the customer complaints cited in the supervisor's memo were dated in the two weeks between her disclosure of her son's condition and her termination; the accounting supervisor's statements raised a reasonable inference that the company was concerned with the costs of continuing to cover her family; she had been given an 8% raise six weeks before she was fired; and her supervisor admitted that other employees had been warned from five to 50 times about unacceptable performance before being fired.  Viewing the record in the light most favorable to the plaintiff, the Sixth Circuit held that granting summary judgment to the employer was error.

    In this case, the proximity between Pennington's termination and McLaughlin's decision to replace Callos with a new HR company does not support an ERISA interference claim.  Pennington's surgery took place in 2010, two years before the events giving rise to this lawsuit.  He concedes that while he was employed, he received all benefits that he was entitled to, including medical leave with full pay and continuation of health insurance.   McLaughlin's comments about the rising costs of insurance are not tied to any particular management decision, much less a decision about hiring or firing an employee.  These stray comments are too general to raise a reasonable, plausible inference that McLaughlin fired Pennington with intent to interfere with his medical benefits.  To find that the evidence in the record here is sufficient would allow every employee who is covered by a discretionary medical benefit plan to raise an ERISA claim after being terminated.  As another judge in this district recently noted, "Proof of specific intent is required to establish an ERISA §510 violation because the loss of benefits is incidental to every termination."  Jett v. Am. Nat'l Red Cross, 3 F.Supp.3d 695, 706 (S.D. Ohio 2014)(Weber, J.), quoting Williams v. United Steel

Workers of Am., 2010 U.S. Dist.. LEXIS 22295 (S.D. Ohio 2010), aff'd 487 Fed. Appx. 272 (6th Cir. 2012).

Defendants are therefore entitled to entry of summary judgment on Count Five, Pennington's claim under ERISA.

**CONCLUSION**

For all of the foregoing reasons, the Court grants in part and denies in part the Defendants' motions for summary judgment (Docs. 29 and 32).  Summary judgment is granted on Counts 2, 3, 4, and 5 of Pennington's complaint, his claims under the FMLA, for disability discrimination, and under ERISA.  The motions are DENIED with respect to Count One, Pennington's claims for age discrimination, which remain for trial.

SO ORDERED.

DATED: May 19, 2015                             s/Sandra S. Beckwith
                                                Sandra S. Beckwith, Senior Judge
                                                United States District Court